IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,       )
                                )
            v.                  )       1:12-cr-00264-1
                                )       1:12-cr-00264-2
CHARLES  WILLIAMS,  JR.,  and   )
ELISABETH MACMULLEN             )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Defendants Charles Williams, Jr. ("Williams"), and Elisabeth MacMullen ("MacMullen") (collectively "Defendants") are charged with possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). This matter was initially before the court on Defendants' motions to suppress the cocaine and all other evidence seized from, and statements made by, them as a result of a February 13, 2012, search of their automobile on Interstate 85 in Lexington, North Carolina. (Docs. 19, 20.) An initial hearing was held on November 20, 2012 ("initial hearing"), and the court entered a Memorandum Opinion and Order denying Defendants' motions (Doc. 27, denying Docs. 19 & 20).

On the morning of trial, March 11, 2013, Defendants moved the trial judge to reconsider this court's prior ruling in light of new evidence produced by the Government; namely, a DVD

recording from a camera in the patrol car of a deputy involved in the traffic stop of Defendants (Doc. 44). Defendants contended, among other things, that one of the reasons relied upon by the court in denying the motions to suppress was contradicted by the new evidence, which Defendants assert casts doubt on the credibility of the deputies who testified. The matter was returned to this court, which agreed to reconsider the motions and held a second evidentiary hearing on March 21, 2013 ("reconsideration hearing").

This Memorandum Opinion and Order supersedes the court's prior ruling (Doc. 27). For the reasons set forth below, the court reaffirms its conclusion that the Government did not violate Defendants' Fourth Amendment rights, and Defendants' motions to suppress were properly denied.

## I.    BACKGROUND

In order to understand the nature of the motion for reconsideration, it is helpful to recount the evidence presented at the two evidentiary hearings.

### A.    Initial Hearing: November 20, 2012

At the initial hearing, the Government presented the testimony of Deputy Justin Lee Russell ("Deputy Russell"), a seven-year veteran, and Sergeant Jerry Wayne Soles, Jr. ("Sergeant Soles"), a thirteen-year veteran, respectively, of the Davidson County (North Carolina) Sheriff's Office. Based on

2

the testimony of these officers and video evidence gathered from Deputy Russell's in-car video recorder (which bears a time counter synchronized with a clock),[1] the court found the following facts:

Deputy Russell and Sergeant Soles were separately patrolling Interstate 85 in the early morning hours of February 13, 2012. At some point, Sergeant Soles observed two vehicles travelling closely together in a southbound lane and at a high rate of speed. At 12:38 a.m., Deputy Soles stopped the forward vehicle, and Deputy Russell stopped the rear vehicle, a Gold Hyundai Sonata that Williams was driving and in which MacMullen was riding as a passenger.

Upon initiating the traffic stop, Deputy Russell informed Williams that he was stopped for driving 80 m.p.h. in a 70 m.p.h. zone and requested Williams' driver's license and vehicle registration. Williams provided a New York driver's license and a rental agreement for the vehicle (Gov't Ex. 1). The rental agreement showed that the car was rented by MacMullen on February 10, 2012, in Totowa, New Jersey, and was due to be returned there on February 13, 2012, by 2:30 p.m. (Id.)

---

[1]   Unless otherwise stated, all times herein are based on the time displayed in Deputy Russell's in-car video recording. (Gov't Ex. 2 (Video from Deputy Russell's Patrol Car).)

3

Deputy Russell requested that Williams exit the vehicle and sit in the patrol car while Deputy Russell checked Williams' documents. Williams acquiesced. MacMullen remained in the passenger seat of the Hyundai.[2]

Once inside the patrol car, Deputy Russell engaged Williams in conversation as the license check was conducted. During the course of their conversation, Williams indicated that they had stopped at his mother's house in Virginia Beach and were traveling to Charlotte, North Carolina, to visit his brother for a couple of days. Deputy Russell smelled alcohol on Williams' breath and asked if he had had anything to drink. Williams responded that he had a beer with supper. Deputy Russell contacted Sergeant Soles, who was still engaged in his traffic stop of the other vehicle fewer than 100 yards in front of Deputy Russell, to assist by administering a breathalyzer test on Williams. Sergeant Soles cut his stop short, giving the driver a warning, so he could assist Deputy Russell, and at approximately 12:45 a.m. he pulled his car, in which he also kept a drug dog, behind Deputy Russell's vehicle.

---

[2]   Williams stated he needed to use a restroom and asked for the location of the nearest rest stop. Deputy Russell informed him that he had just passed one. Williams asked for permission to relieve himself on the grassy area by the side of the road, which he was permitted to do before entering the patrol car.

4

Upon arriving at the scene, Sergeant Soles approached the front passenger side of Deputy Russell's patrol car and greeted Williams through the open window (12:46:13 a.m.). Sergeant Soles testified that from there he could hear Williams' remaining conversation with Deputy Russell. Williams told Sergeant Soles he had consumed a beer, and Sergeant Soles administered the breathalyzer test as Williams remained seated in Deputy Russell's patrol car and Deputy Russell left to speak with MacMullen in the Hyundai Sonata.

While speaking with MacMullen, Deputy Russell inquired of Williams' alcohol consumption and their travel plans. MacMullen said that Williams had little to drink and that they were on their way to Charlotte. Deputy Russell asked her why they were going to Charlotte, to which she responded, "I don't know, we are just on vacation."

While Deputy Russell was speaking with MacMullen, Sergeant Soles conversed with Williams in connection with the administration of the breathalyzer test. During the course of this conversation, Williams told Sergeant Soles that he was on vacation and was going to visit his brother. He also told Sergeant Soles that his brother was driving the car Sergeant Soles had pulled over and that the two vehicles were traveling to Charlotte together. Sergeant Soles testified that this contradicted the statement of the driver of the first car who

had told him "he wasn't traveling with anybody." (Doc. 43 at 63:18.)[3]

Upon Deputy Russell's return to his vehicle, Sergeant Soles informed him that Williams' alcohol level was within the legal limit. Sergeant Soles continued to listen in on and participate in the remainder of the conversation, as Deputy Russell advised Williams that he would issue a warning ticket for speeding. When Deputy Russell requested an address for the purpose of completing the warning, Williams did not provide a physical address, but only gave a post office box for a company for which he said he worked in New York.

As Deputy Russell engaged in writing the warning ticket, Sergeant Soles asked Williams where he lived. Williams said he lived in both New York and New Jersey and that he and MacMullen share a child and lived together. Sergeant Soles asked where Williams was headed, and Williams said Charlotte; in response to a question of how long they were planning to stay, Williams said they were staying at the Wyndham hotel and it depended on how his brother's wife acted as to how long they would stay. Deputy Russell pointed out that the rental car was due that same day, and Williams said he would have to renew the contract in Charlotte.

_____

[3]  It is the testimony of Sergeant Soles on this point that is the basis of Defendants' motion for reconsideration.

6

Deputy Russell completed the warning ticket at 12:54:51 a.m. and gave it to Williams, who began to open the car door and lean to exit the patrol car. As he did so and as Sergeant Soles continued to listen in, Deputy Russell asked at 12:54:57 if he could ask a question before Williams left. Williams responded affirmatively with "uh, huh." Deputy Russell asked, "Nothing illegal in the car?" to which Williams responded there was not. Deputy Russell then asked, at 12:55:03 a.m., if he could search the car. Williams, while leaning to open the car door, responded with "uhhh." At 12:55:05 a.m., Deputy Russell repeated whether he could search the car. Williams, who was still leaning to open the patrol car door, asked, "for alcohol?" Deputy Russell again asked, "Can I search the vehicle?" (12:55:07 a.m.), and Williams responded by stating "there ain't any alcohol in there – we haven't been drinking." At 12:55:12 a.m., Deputy Russell said, "I am just asking you if I can search the vehicle." Williams, who was still leaning as if to exit the patrol car, paused and stated "you can look inside, there ain't no alcohol inside, no open container, nothing, I only had a beer." Russell sought clarification (12:55:22 a.m.) by asking "so you are saying I can look inside the vehicle?" Williams gave an inaudible response, to which Deputy Russell responded, "huh?" Deputy Russell again asked for consent to search (12:55:32 a.m.). At this point, Deputy Russell and Williams

were both exiting the patrol car and Williams headed toward his vehicle; Williams did not respond to Deputy Russell's question. Once the two men were outside, at 12:55:39 a.m., Deputy Russell asked "is it a yay or nay?" While Williams was walking back to his vehicle, he again stated there was no alcohol in the car. Deputy Russell again questioned whether Williams was giving consent to search at 12:55:46 a.m., as Williams, Sergeant Soles, and Deputy Russell were all approaching the Hyundai. In response, Williams opened the rear driver's side door and made a gesture indicating that the officers could look inside. As Williams was doing so, Deputy Russell shone his flashlight into the car. Williams continued to stand on the interstate and was therefore exposed to oncoming traffic.

In the interests of safety and based on his observation of the conversation, Sergeant Soles asked Williams to step to the rear of the vehicle out of the highway (12:56:02 a.m.). Sergeant Soles then told Williams, "He asked you a question. You opened the doors up and I assumed that's a yeah, but," to which Williams interrupted saying, "we don't have no alcohol in there." Sergeant Soles said, "I understand that. He asked you a question. It's a yes or no answer." Williams interjected, "no." The time was 12:56:22 a.m. Sergeant Soles responded, "ok." Sergeant Soles testified that it was at this point that he decided to conduct a canine sniff.

Immediately after Williams refused consent to a search, Sergeant Soles advised Williams that MacMullen needed to get out of the car so that a drug dog could be deployed. At 12:56:28 a.m., MacMullen exited the vehicle. Sergeant Soles then removed his drug dog, Dakota, from his patrol car and "broke" her, meaning he allowed her to relieve herself on the grass beside the vehicles. He then walked her around the vehicle, starting at the rear, and Dakota alerted to the presence of narcotics upon completing the full circle at the rear driver's side of the trunk. The time was 12:59:02 a.m.

Based on this record, the court entered an extensive Memorandum Opinion and Order denying the motions to suppress. (Doc. 27.)

**B. Reconsideration Hearing: March 21, 2013**

At the reconsideration hearing, Defendants presented a DVD recording taken from Sergeant Soles' in-car video recorder,[4] and the Government again presented the testimony of Sergeant Soles and Deputy Russell. Based on the evidence, the court now modifies its previous factual findings set forth above with the following additional facts:

In the early morning hours of February 13, 2012, Sergeant

---

[4] The Government reported it produced the recording approximately two weeks before trial because only then had it become apparent that the activities related to the stop of the first car might be relevant to the case.

Soles and Deputy Russell were both patrolling Interstate 85, although they were not at the same location. At some point prior to 12:38 a.m., Sergeant Soles used his in-car communication equipment to contact Deputy Russell and inform him that he was observing two cars traveling together at a high rate of speed. (Gov't Ex. 2 (Video from Sergeant Soles' Patrol Car), 1:00.)[5] Deputy Russell responded that he would pull behind Sergeant Soles (id. at 1:03), and Sergeant Soles provided him license plate information about the second vehicle (id. at 1:07). Sergeant Soles then told Deputy Russell to "see if you can get a violation on your own, and if not we'll use one of mine." (Id. at 1:16.) Deputy Russell responded "alright." (Id. at 1:25.)[6]

Approximately 50 seconds after communicating with Deputy Russell, Sergeant Soles initiated a traffic stop of the first vehicle by activating his patrol car's lights and siren. (Id. at 2:21.) After the car pulled off the interstate, Sergeant Soles spoke with the car's driver and informed him that he had

---

[5] The DVD recording taken from Sergeant Soles' patrol car is not time stamped, so the time citations displayed as the recording plays are only relevant for determining the length of time between events.

[6] Deputy Russell was several miles away, and it took him approximately three minutes to catch up with Sergeant Soles and the two vehicles. At that point, Deputy Russell paced Defendants' vehicle for a quarter mile and then initiated a traffic stop. The events of the traffic stop are accurately described above (see supra Part I.A) as they were captured on the video recorder in Deputy Russell's patrol car.

10

been stopped for speeding. (Id. at 2:59.) Sergeant Soles then asked if the driver was traveling with the car behind him (Defendants' vehicle). (Id. at 3:33.) The driver can be heard on the recording as having responded, "we together." (Id. at 3:41.) Sergeant Soles then had the driver accompany him to the patrol car, where Sergeant Soles conducted a license check and the driver again indicated, when asked, that he was traveling with Defendants. (Id. at 5:14 (Q: "Who's the people traveling with you?" A: "That's my brother and his fiancée").) Sergeant Soles then gave the driver a verbal warning to slow down (id. at 6:34) and informed the driver that he was free to go (id. at 6:37).

In his testimony, Sergeant Soles acknowledged that the recording from his in-car video recorder, which he had not reviewed before the initial hearing, contradicts his prior testimony at that hearing. He maintained that his prior recollection was simply mistaken.

Deputy Russell testified and reaffirmed that he stopped Defendants' vehicle because they were exceeding the posted 70 m.p.h. speed limit by ten miles per hour. His testimony is consistent with his statements recorded on the DVD from his in-car video recorder, which also shows that Deputy Russell told Williams that he was being stopped for speeding.

## II. ANALYSIS

Defendants seek to suppress all evidence from the search of their vehicle on February 13, 2012. They argue that Sergeant Soles contrived a reason for Deputy Russell to stop Defendants' vehicle. They further argue that the officers lacked a reasonable, articulable suspicion of criminal activity to conduct the drug dog sniff after the completion of the traffic stop, which they contend violated their Fourth Amendment rights.[7] The Government contends that the deputies legitimately stopped Defendants' vehicle for speeding and had a reasonable, articulable suspicion supporting their seizure of Defendants to authorize a drug dog sniff of their vehicle. Alternatively, the Government argues that even if reasonable suspicion to extend the traffic stop was lacking, the *de minimis* delay between Williams' refusal to consent to a search of the vehicle and the drug dog's alert did not intrude on Defendants' Fourth Amendment rights.

The Federal Rules of Criminal Procedure do not address whether a party may move for reconsideration of a decided motion, but courts generally assess such a motion using the standards applicable under Federal Rule of Civil Procedure

---

[7] Defendants do not challenge the qualification of the drug dog or its handler, Sergeant Soles.

Case 1:12-cr-00264-WO   Document 45   Filed 04/09/13   Page 12 of 40

59(e).  See United States v. Carroll, No. 7:12–CR–57–F, 2012 WL 5350364, at *1 (E.D.N.C. Oct. 29, 2012) (collecting cases). Under those standards, the court may entertain a motion to reconsider its ruling on a motion to suppress in order (1) to accommodate an intervening change in controlling law, (2) to account for new evidence not previously available, or (3) to correct a clear error of law or prevent manifest injustice.  See Zinkand v. Brown, 478 F.3d 634, 637 (4th Cir. 2007).  In this case, Defendants base their motion for reconsideration on newly discovered evidence.  Although the standards for new evidence to be considered on a motion for reconsideration are high, see Quillin v. C.B. Fleet Holding Co., Inc., 328 F. App'x 195, 203 (4th Cir. 2009) (per curiam), the court will consider the new evidence in this case in the interests of justice and because it does not appear to have been available to Defendants at the time of the initial hearing.  Cf. United States v. Dickerson, 971 F. Supp. 1023, 1024 (E.D. Va. 1997) (reconsideration of motion to suppress denied where there was no indication the evidence was unavailable at the time of the hearing); see also United States v. Bayless, 201 F.3d 116, 132 (2nd Cir. 2000) (reconsidering motion to suppress based on new evidence in the "interests of justice").  Further, the Government stated at the reconsideration hearing that it does not oppose the motion to reconsider as it relates to the new DVD evidence from Sergeant

13

Soles' vehicle but does continue to oppose the motions to suppress.

The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Even a temporary detention of individuals during the course of an automobile stop by the police, "even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996). To determine whether a traffic stop runs afoul of the Fourth Amendment, courts employ the Supreme Court's test from Terry v. Ohio, 392 U.S. 1 (1968). United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011). Under the Terry analysis, the court first asks whether the officer's action was "justified at its inception," United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992), and then whether the continued stop was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure," Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion). "Notably, the reasonable suspicion standard 'is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). However, the Government must show "a

14

minimal level of objective justification" for the law
enforcement action. Id.

### A. Legitimacy of the Traffic Stop

Defendants argue that the video from Sergeant Soles' in-car
recorder now demonstrates that he and Deputy Russell were on a
"fishing expedition" to conduct a pretextual stop and that
Sergeant Soles' recantation of his prior testimony casts doubt
on his credibility when he says the cars were stopped for
speeding. Defendants point specifically to Sergeant Soles'
direction to Deputy Russell to "see if you can get a violation
on your own, and if not we'll use one of mine." (Gov't Ex. 2
(Video from Sergeant Soles' Patrol Car), 1:15.)

The court finds that although the credibility of Sergeant
Soles was called into question at the reconsideration hearing,
Deputy Russell, whom the court finds credible, legitimately
stopped Defendants' vehicle for speeding. To the extent
Defendants are challenging the stop as being pretextual, the
Supreme Court has explicitly authorized this practice, and no
constitutional violation can attach. Whren, 517 U.S. at 813
(rejecting argument that constitutional reasonableness of stops
depends on the actual motivation of the officer); Foreman, 369
F.3d at 787 n.3 (Gregory, J., concurring in part & dissenting in
part) (finding that legality of stop was not in question because
"[a]lthough Trooper Wade admits the reasons for the traffic stop

15

were pretextual, once he observed Foreman speeding . . . probable cause arose"). The court thus finds that the first prong of the <u>Terry</u> analysis is satisfied, <u>see</u> <u>United States v. Pack</u>, 612 F.3d 341, 350-51 (5th Cir. 2010) (noting that when a defendant was stopped for speeding, the stop was justified at its inception pursuant to <u>Terry</u>), and the traffic stop was justified at its inception.

**B.   Reasonable, Articulable Suspicion**

A reasonable duration of a traffic stop cannot be determined with "mathematical precision," <u>United States v. Branch</u>, 537 F.3d 328, 336 (4th Cir. 2008), but a stop may become unlawful if it is "prolonged beyond the time reasonably required to complete that mission," <u>Illinois v. Caballes</u>, 543 U.S. 405, 407 (2005). Thus, if a police officer wants to inquire into matters unrelated to the purpose of the initial stop and take actions that do not constitute a "search," such as conducting a dog sniff of the vehicle, <u>id.</u> at 409, the officer must take care that these inquiries or other actions "do not measurably extend the duration of the stop." <u>Arizona v. Johnson</u>, 555 U.S. 323, 333 (2009). Further, if an officer wishes to prolong a traffic stop beyond the scope of a routine stop, the driver must either grant consent, or there must be reasonable suspicion of illegal activity. <u>United States v. Digiovanni</u>, 650 F.3d 498, 507 (4th Cir. 2011); <u>Branch</u>, 537 F.3d at 336. Here, Defendants do not

16

challenge the length of the detention up to the point that Williams was given his warning ticket.

The Government contends that the traffic stop was permissibly prolonged beyond the issuance of the warning ticket because there was reasonable suspicion that Defendants were engaged in drug trafficking activity. In assessing reasonable suspicion, the court looks to the totality of the circumstances, United States v. McCoy, 513 F.3d 405, 411 (4th Cir. 2008), to determine if the detaining officer had a "particularized and objective basis for suspecting legal wrongdoing," United States v. Arizu, 534 U.S. 266, 273 (2002) (internal quotations omitted).

The Government identifies six factors it claims leads to the conclusion that reasonable suspicion existed when Deputy Russell and Sergeant Soles extended the traffic stop to allow the drug dog to sniff Defendants' vehicle: (1) Defendants were traveling on a known drug corridor; (2) Defendants gave inconsistent reasons for their trip; (3) Williams could not provide a home address; (4) Williams was "nervous" when interacting with Deputy Russell; (5) Defendants' stated travel plans were contrary to and exceeded the rental contract; and (6) Williams gave allegedly evasive answers to Deputy Russell's

17

request for consent to search the car.[8]

Before turning to these factors, it is important to clarify the framework for the court's analysis. The Government urges that the court rely on the collective knowledge of both deputies in determining whether articulable, reasonable suspicion existed. However, the collective knowledge doctrine "does not permit [the court] to aggregate bits and pieces of information from among myriad officers," even if they are all present, for "the legality of the search would depend solely on whether, after the fact, it turns out that the disparate pieces of information held by different officers added up to reasonable suspicion." United States v. Massenburg, 654 F.3d 480, 493 (4th Cir. 2011). An officer who orders a search cannot rely on the collective knowledge doctrine unless he actually received information or instructions from another officer. Id. at 493-

---

[8] At the initial hearing, the Government relied on a seventh factor: the inconsistency between Williams' statement that the car traveling ahead of him was driven by his brother and Sergeant Soles' testimony that the first car's driver told him that his car was not being followed. (Doc. 43 at 63:18.) The court relied on this inconsistency as providing further suspicion that criminal activity may have been afoot. (Doc. 27 at 15.) With the production of the DVD from Sergeant Soles' vehicle, however, it is now obvious that Sergeant Soles' testimony was incorrect, and he has recanted it on the grounds that he had not reviewed the DVD before he first testified and his recollection at the time was mistaken. On reviewing the initial hearing transcript, the court is concerned that Sergeant Soles' testimony on this point was not directly responsive to the immediate question before him and thus has some quality of having been volunteered, whether carelessly or otherwise. Because the Government has abandoned this factor, the court will not consider it as a possible basis for providing reasonable suspicion.

18

94. This articulation of the rule, the Fourth Circuit has cautioned, serves the deterrent purposes of the Fourth Amendment by inquiring into "each individual officer's decision-making process as she considers . . . effecting a seizure." Id. at 495.

Here, Sergeant Soles testified that he decided to conduct the drug dog sniff on his own order, and there is no evidence that Deputy Russell did so or participated in the decision. Thus, the question is whether Sergeant Soles possessed articulable, reasonable suspicion to warrant any extension of the detention from the time Deputy Russell issued the warning citation. In making this assessment, the court may examine what, if anything, Sergeant Soles learned directly from Deputy Russell. With this clarification, the court now turns to the factors identified by the Government.

The first factor offered by the Government in support of its position that reasonable suspicion existed to extend the traffic stop is that Defendants were traveling on an interstate that is a known drug corridor. Travel along a drug corridor is indeed a factor that can contribute to a finding of reasonable suspicion. Foreman, 369 F.3d at 785. Deputy Russell and Sergeant Soles both testified that Interstate 85 is a known drug corridor for the East Coast, and it has been recognized as such. United States v. $50,720.00 in U.S. Currency, 589 F. Supp. 2d

19

582, 584 (E.D.N.C. 2008) (Interstate 85 is a "known drug corridor for illegal drugs"). Because many travelers frequenting Interstate 85 do so legally, however, this factor alone is insufficient but is a proper consideration if buttressed by sufficient other information.

The Government next points to alleged inconsistencies in Defendants' descriptions of their travel plans. Inconsistencies in travel plans can support a finding of reasonable suspicion of drug activity where they contain an indicia of untruthfulness. See United States v. Sang, 89 F.3d 831 (4th Cir. 1996) (per curiam) (unpublished table decision)[9] (finding reasonable suspicion where driver's stated travel plan was inconsistent with that provided by the passenger); United States v. Chapple, No. 09-20224, 2010 WL 2817188, at *4 (E.D. Mich. 2010) (finding reasonable suspicion where inconsistencies "contain an indicia of untruthfulness that is particularly suspicious in the mind of a reasonable police officer"); United States v. Garcia, 52 F. Supp. 2d 1239, 1248, 1251 (D. Kan. 1999) (finding that inconsistent travel plans contributed to reasonable suspicion where the driver of one car said they were traveling to Wichita

---

[9]   Unpublished decisions are not precedential but are cited for their persuasive authority. Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (noting that unpublished decisions have no precedential value and are "entitled only to the weight they generate by the persuasiveness of their reasoning" (quoting Hupman v. Cook, 640 F.2d 497, 501 & n.7 (4th Cir. 1981))).

for a month but some might head back after only a week while the driver of the other car said they were going to Wichita for only a week).

The alleged inconsistencies here are that Williams told Sergeant Soles he was going to Charlotte to a hotel and was going to be "visiting his brother in Charlotte for a couple of days," whereas MacMullen told Deputy Russell, "we are going to Charlotte . . . I don't know, we are just on vacation". But there is no evidence that either deputy was aware of the other Defendant's statement. So, this factor will not be considered further.

The Government's next factor is the fact that Williams could not provide a home address and only provided a Post Office Box. Courts have previously determined that a defendant's failure to provide a home address can be a factor contributing to reasonable suspicion. See, e.g., United States v. Patton, 182 F.3d 929, at *2 (9th Cir. 1999) (unpublished) (finding that the defendant's failure to provide a home address contributed to a finding of reasonable suspicion). It is noteworthy that there were other inconsistencies regarding Williams' address. Specifically, the Post Office Box Williams provided was different from the Post Office Box listed on his New York driver's license. Further, at one point Williams stated that he lived in both New York and New Jersey, and although he did say

21

that he and MacMullen lived together and her driver's license listed a residential address in New Jersey, Williams was unable to provide a home address in New York, the state from which his driver's license was issued. The different addresses and explanations given by Williams on this point may have legitimately raised suspicion. Cf. United States v. Newland, 246 F. App'x 180, 189 (4th Cir. 2007) (unpublished) (finding reasonable suspicion when the defendant gave three different addresses and could not explain why one of those addresses was used on the rental agreement).

The Government proffers next that Williams was nervous while interacting with Deputy Russell. Nervousness may support a finding of reasonable suspicion in the totality of the circumstances. United States v. Mason, 628 F.3d 123, 129 (4th Cir. 2010); Branch, 537 F.3d at 338. For example, the Fourth Circuit has recently found that a defendant's extreme nervousness contributed to a finding of reasonable suspicion when the defendant was shaking, breathing heavily, had trembling hands, and his heartbeat was visible through his shirt. United States v. Vaughn, 700 F.3d 705, 711 (4th Cir. 2012).

In this case, Deputy Russell testified that Williams was "about as nervous as anybody I dealt with." Deputy Russell did not explain his prior experience, however, but did later state that Williams' nervousness was evidenced by his refusal to make

22

eye contact and his "chattered breath." Nervousness is an appropriate consideration when the officer can point to specific behaviors that indicate nervousness above the normal level that can be expected when an ordinary citizen is detained for a routine traffic stop, such as trembling hands, United States v. McFarley, 991 F.2d 1188, 1192 (4th Cir. 1993), heavy breathing, id., or avoiding eye contact, United States v. Adebanjo, 54 F.3d 774, at *5 (4th Cir. 1995) (unpublished table decision). See Vaughan, 700 F.3d at 711 n.8 (indicating that only excessive signs of nervousness contribute to reasonable suspicion, because most people are generally nervous in some way when pulled over by the police).

The court has independently reviewed the video from Deputy Russell's in-car recording equipment that shows Williams throughout the vast majority of the traffic stop and cannot discern excessive or unusual nervousness by Williams during his interaction with the officers. See Digiovanni, 650 F.3d at 512 (affirming district court's decision to discount nervousness as a factor when video from the encounter revealed the defendant was calm and cooperative). As such, while the court does not doubt Deputy Russell's testimony that he believed Williams appeared nervous, there is no description of excessive nervousness observed by him or Sergeant Soles, or that is apparent on the video, to support a finding of reasonable

23

suspicion in this case.  Therefore, the court will not consider
nervousness as a factor.

The next factor the Government cites is the discrepancy
between the vehicle rental contract, the time and date of the
stop, and Williams' stated travel plans.  To be sure, the fact
Defendants were traveling in a rental car, although alone
possibly innocuous, as many innocent travelers do so, can be
relevant to the reasonable suspicion analysis.  United States v.
Contreras, 506 F.3d 1031, 1036 (10th Cir. 2007) (considering, as
contributing to reasonable suspicion, the fact that rental cars
are often used by narcotics traffickers); see also United States
v. Brugal, 209 F.3d 353, 358 n.5, 359-60 (4th Cir. 2000) (en
banc) (reversing district court's grant of motion to suppress
and noting fact of rental car from Miami, Florida, as factor).
Further, unusual travel plans can be a factor to be considered
for reasonable suspicion, Foreman, 369 F.3d at 785, including
whether the defendant's stated travel plans are inconsistent
with the date and time the rental car is due to be returned,
United States v. Powell, 277 F. App'x 782, 787 (10th Cir. 2008)
(finding that duration of the rental agreement combined with the
implausible length of the trip contributes "at least something
to the reasonable suspicion calculus"); see also United States
v. Boyce, 351 F.3d 1102, 1109 (11th Cir. 2003) (noting that a
plan to return a rental car late is alone not enough for

24

reasonable suspicion, although it may be considered when combined with other factors).

In this case, the rental agreement shows that MacMullen rented the vehicle on February 10, 2012, at 3:02 p.m. in Totowa, New Jersey.[10] The traffic stop occurred on February 13, 2012, at 12:37 a.m., in Lexington, North Carolina. Although Sergeant Soles did not review the rental agreement, he did overhear Williams, when asked about his travel plans, state that he was going to Charlotte and would be staying at a hotel for an indefinite length of time. He also overheard Deputy Russell say that the car was due back that very day in New Jersey and heard Williams respond that they would need to seek an extension of the rental agreement. Thus, Sergeant Soles was aware that Defendants' stated travel plans were inconsistent with and would likely exceed the authorized rental under the agreement.

There are certainly a "large number of innocent travelers who extend their trips beyond the time originally provided for

---

[10] The rental contract indicates that only MacMullen was authorized to drive the vehicle, but no party has argued that this fact weighs in favor of or against a finding of reasonable suspicion. Moreover, there is no argument that because of this Williams would lack standing to contest the search as the fruit of an unlawful detention. Cf. Brendlin v. California, 551 U.S. 249 (2007) (vehicle passenger was seized and thus entitled to challenge the stop's constitutionality); United States v. Mubdi, 691 F.3d 334, 339 n.5 (4th Cir. 2012) (noting that an unauthorized driver of a rental car had argued that he had standing to challenge the search because it was the fruit of an unreasonably long seizure, not an illegal search; however, the court did not reach this argument, leaving the issue unresolved).

in their rental agreements." Boyce, 351 F.3d at 1110 n.6.
However, Defendants' stated travel plans, considered in
connection with the rental agreement, certainly raise an
inconsistency that could contribute to the reasonable suspicion
consideration. See Newland, 246 F. App'x at 189 (defendant's
plan to drive to New York from the scene of the traffic stop in
Maryland, when rental plan required the vehicle to be turned in
4 hours after the traffic stop, contributed to a finding of
reasonable suspicion). The court will therefore consider this
factor.

The final factor identified by the Government to support a
finding of reasonable suspicion is that Williams provided
evasive answers when Deputy Russell was asking for consent to
search the car. In fact, as the video shows, Williams gave
vague and evasive answers multiple times before he gave a clear
answer to a request for consent to search his vehicle. Although
Williams' responses to Deputy Russell's requests for consent
were unclear, the Government has not cited any authority in
support of its argument that these are proper considerations.

The Fourth Circuit has expressed concern over resting a
finding of reasonable suspicion on the exercise of one's
constitutional right to refuse consent to a police search.
United States v. Wilson, 953 F.2d 116, 126 (4th Cir. 1991) ("We
are wary of allowing the exercise of the unequivocal right to

ignore the police to be grafted onto the 'reasonable suspicion' analysis."). Other courts have disapproved of it. See Boyce, 351 F.3d at 1110 ("The police cannot base their decision to prolong a traffic stop on the detainee's refusal to consent to a search."); United States v. Nunley, 873 F.2d 182, 185 n.4 (8th Cir. 1989) (noting that "[r]efusal to listen [to] or answer [inquiries by an officer] [does] not furnish the basis for detention"). To be sure, the Government does not rely on Williams' direct refusal to consent to a search (i.e., his denial of the deputy's request after being asked to provide a yes or no answer). And the Fourth Circuit has not ruled out the possibility that the manner of a response could be relevant. See Wilson, 953 F.2d at 126 (stating "[w]e are not prepared, however, to rule that the form of a denial can *never* be included as a factor to be considered in determining whether an investigative stop was justified," but expressing concern over its prominence as a factor relied on by the officer (emphasis in original)).

Here, Williams had a constitutional right to refuse consent. It is apparent that the deputies were justifiably concerned whether they correctly understood Williams' responses, especially when Williams said "you can look inside but there isn't alcohol inside" and when he subsequently opened the rear car door and gestured inside. However, because the motions to

27

suppress can be decided without reliance on this factor, the court declines to consider it further.[11]

In opposition to the factors identified by the Government, Defendants argue that the credibility of the officers has been so compromised by the new evidence produced at the reconsideration hearing that the officers cannot be believed, and thus the court should refuse to find reasonable suspicion. In addition to the credibility issues surrounding Sergeant Soles' testimony, Defendants challenge the credibility of Deputy Russell based on alleged discrepancies in the timing of events. Specifically, Defendants note that Deputy Russell's warning ticket bears the hand-written time of 12:45 a.m. (Gov't Ex. 1.) They argue that this contradicts the times reflected on the video from Deputy Russell's in-car recorder (which showed that he finished issuing the ticket at 12:54:51 a.m.), more accurately reflects when Deputy Russell completed his citation, and therefore is evidence that the deputies unnecessarily

---

[11] Inasmuch as the reasonable suspicion analysis is an objective one, the court notes that Sergeant Soles was also aware of the fact that Defendants were traveling late at night/early in the morning. See United States v. Clarkson, 551 F.3d 1196, 1202 (10th Cir. 2009) (stating that the fact that it was "late at night" was a consideration that has been "recognized [] as supporting reasonable suspicion"). Here, Defendants were traveling at approximately 12:37 a.m. and were, according to the evidence, still about an hour from Charlotte. See Gallegos v. City of Colo. Springs, 114 F.3d 1024, 1029 (10th Cir. 1997) (stating that "the time of night," which happened to be around 1:00 a.m., was considered in determining that there was reasonable suspicion).

prolonged what should have been a routine traffic stop by several minutes.

The Government contends that Defendants' argument about the timing of the citation should not be raised on a motion for reconsideration because it is not related to the new evidence and could have been raised at the initial hearing. See Carroll, 2012 WL 5350364, at *2 (noting that on a motion to reconsider a motion suppress, movant cannot raise arguments that could have been raised prior to the issuance of the judgment). The court agrees. The issue is largely moot, however, because the court accepts Deputy Russell's testimony that he entered the time on the traffic citation based on the time displayed by his patrol car's clock, which is not synchronized with the recorder and can be up to approximately nine minutes off. He also testified that the video recorder, while not properly synchronized with his patrol clock, nevertheless records the passage of time accurately as it operates. Thus, the court finds that even if the DVD's time stamp is technically incorrect when compared to outside sources (that is, on an absolute basis), the video evidence reliably displays the content and relative timing of the events that occurred during the traffic stop, including the writing of the citation. It is clear that Deputy Russell exercised due diligence in conducting his duties and completed

the citation immediately before Williams began to leave the patrol car.

Thus, the difficulty Defendants face is that, notwithstanding the credibility issues regarding Sergeant Soles' testimony, the video evidence (which contains audio) from both deputies' vehicles covers the duration of the traffic stop and accurately describes what happened during the vast majority of the stop. The court has reviewed the entirety of all video evidence several times and is persuaded that the credibility issues raised do not undermine the ultimate bases for considering whether reasonable suspicion existed to prolong the traffic stop.

In considering the totality of the circumstances, "[t]he Supreme Court has recognized that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion." Brugal, 209 F.3d at 359 ("[A]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion." (citing United States v. Sokolow, 490 U.S. 1, 9 (1989))). The Terry reasonable suspicion standard does require "'a minimal level of objective justification' for the police action." Id. (citation omitted). The factors, taken together with rational inferences therefrom, must evince more than an "inchoate and unparticularized

30

suspicion or hunch of criminal activity" to justify further detention. Branch, 537 F.3d at 336 (citations and internal quotations omitted). "The articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." Id.

Here, the Government's argument for a finding of reasonable suspicion must rest on the fact that (1) Defendants were travelling in a rental car (2) on a known drug corridor at 12:37 a.m. where (3) Williams' stated travel plans were inconsistent with, and would likely exceed, the due date for return of the rental car; and (4) Williams was unable to provide a permanent home address in New York even though he claimed to live there at least part-time and had a New York driver's license. While each of these factors alone might be insufficient to demonstrate reasonable suspicion of criminal activity, taken together they eliminate a substantial portion of innocent travelers. The Terry reasonable suspicion standard is a "commonsensical proposition," and courts should credit "the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); see United States v. Day, No. 1:05CR460, 2006 WL 306644 (E.D. Va. Feb. 8, 2006) (finding reasonable suspicion when defendant was traveling in a rental car, provided inconsistent

31

travel plans, and the rental car was overdue); *see also* Pack, 612 F.3d 341 (nervousness, conflicting stories, and travel along drug corridor travel enough); United States v. Goss, 852 F. Supp. 2d 871 (W.D. Mich. 2012) (implausible and inconsistent statements and travel along drug corridor enough).

The court finds therefore that these facts, when presented to a reasonable officer, provide reasonable, articulable suspicion that criminal activity may be afoot to justify Sergeant Soles' limited detention for the purpose of deploying the drug dog, which was already on the scene.

### C.  Extension of the Traffic Stop

As an alternate ground, the Government contends that the actions of the deputies in deploying the drug dog for a sniff following Williams' refusal to consent to a search (from 12:56:22 a.m. to Dakota's alert at 12:59:02 a.m., a period of 2 minutes and 40 seconds) was a *de minimis* intrusion on Defendants' Fourth Amendment rights.  Defendants argue that once the warning ticket was issued, Williams was free to leave and should not have been detained for a dog sniff of his vehicle.[12]

As an initial matter, the court finds that no Fourth Amendment violation occurred during the time Deputy Russell

---

[12] At the initial hearing, Williams' counsel argued that the time following the issuance of the warning citation constituted a separate detention requiring a new justification.  The Fourth Circuit has rejected this "two detention" analysis.  See Foreman, 369 F.3d at 782-84.

32

engaged Williams in conversation following the completion of the traffic stop. A consensual conversation between an officer and a citizen at the end of a traffic stop does not run afoul of the Fourth Amendment's protections. United States v. Farrior, 535 F.3d 210, 218 (4th Cir. 2008) (noting that "the end of the traffic stop did not signal the beginning of an unconstitutional seizure in this case" where officers commenced a consensual encounter with the driver); McFarley, 991 F.2d at 1191. Thus, although a traffic stop is complete at the point the purpose of the stop is fulfilled and the defendant is free to go, Johnson, 555 U.S. at 333, a consensual exchange following the stop is within the bounds of the Fourth Amendment, Rusher, 966 F.2d at 877.

In this case, the video evidence shows that the traffic stop was complete when Deputy Russell returned Williams' license and registration and issued him the warning ticket at 12:54:59 a.m. At this point, Williams was free to go, which is evidenced by the fact that Williams leaned toward the patrol car door and began to open it. Farrior, 535 F.3d at 219 (noting "[t]he fact that [the officer] had returned [defendant's] license and registration also strongly indicates that the encounter was consensual and that no seizure occurred within the meaning of the Fourth Amendment"); United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002) (stating that "[c]ircumstances where the

33

citizen would feel free to go, but stays and has a dialogue with the officer, are considered consensual"). Immediately thereafter, Deputy Russell asked Williams if he could ask a question, and Williams responded affirmatively. At no point subsequently did Williams indicate in any way that he desired the questioning to stop, and it is not a bar that Deputy Russell did not seek consent to ask questions continually throughout the encounter. See United States v. Manzano, 135 F. App'x 193, 198 (10th Cir. 2005) ("Where someone voluntarily consents to questioning and does not revoke that consent while the questioning is continuing, it is not necessary for the officer to continually renew consent with each new inquiry.").

Once he established a consensual conversation with Williams, Deputy Russell asked if there was contraband in the vehicle, and then asked for permission to search it, to which Williams only responded "uhhh." For the first minute and twenty-three seconds after the traffic stop was complete, Deputy Russell attempted to determine whether Williams was consenting to a search of the car, while Williams continued to give ambiguous answers that were not denials but were vague and at times partial consents to search. See United States v. Sullivan, 138 F.3d 126, 131-32 (4th Cir. 1998) (holding that a search was consensual even though an officer repeatedly asked questions about the presence of illegal items in the car after

returning a suspect's license at the conclusion of a traffic stop); *see also* Rusher, 966 F.2d at 877 (finding that a conversation between a defendant and an officer after the completion of a traffic stop was consensual even though the officer was asking for consent to search the car). During this time, Williams exited the vehicle and walked back to the Hyundai Sonata as if to leave, further reinforcing the belief he would have felt free to go. The video evidence also shows that both Williams and Deputy Russell were calm during these exchanges, and at no point did Deputy Russell touch Williams, raise his voice, or show his service weapon. Manzano, 135 F. App'x at 198 (noting that there was no seizure after the completion of a traffic stop when the officer asked for consent to search, and the conversation was calm and the officer did not use force or touch his weapon).

Williams points to Sergeant Soles' request that he step to the back of the vehicle as evidence of a detention. On this record, the court concludes that Sergeant Soles had a legitimate concern that Williams, who was standing on the interstate while opening the rear car door and inviting the deputies to search the rear passenger compartment, was exposing himself and the deputies to high-speed interstate traffic (which could be seen and heard passing the site of the traffic stop on the video), and Sergeant Soles' concern was to remove Williams and the

35

deputies from potential harm.  Moreover, at this time Williams was granting an ambiguous consent to search at least part of the interior of the vehicle.  Therefore, the court finds that the time between the completion of the stop (12:54:59 a.m.) and Williams' refusal to consent to a search (12:56:22 a.m.) -- a total of one minute and 23 seconds -- involved a consensual encounter between Williams and the police and did not violate the Fourth Amendment.

Because the time during which Deputy Russell was seeking consent to search the car involved a consensual conversation, the only remaining portion of the traffic stop at issue is the time between Williams' refusal to allow a search at 12:56:22 a.m. and the alert of the drug dog at 12:59:02 a.m.[13]

The Supreme Court has recognized that "[t]here is, of course[,] a *de minimis* level of imposition with which the Constitution is not concerned." Ingraham v. Wright, 430 U.S. 651, 674 (1977).  Following Rusher, which established the parameters of a routine traffic stop in our circuit, the Fourth

---

[13]  To be sure, Sergeant Soles had the drug dog available during the entire encounter prior to this time, but the video evidence demonstrates that both officers appear to have been diligently performing their duties, which included administering the breathalyzer on Williams.  Moreover, on these facts, the court cannot say that the officers, although believing they had reasonable, articulable suspicion to extend a stop to deploy their drug dog, were required to nevertheless do so in lieu of attempting to obtain potential consent to a search during a consensual encounter after completing the traffic purpose of the stop.

Circuit has recognized that in some situations prolonging a traffic stop, even in the absence of reasonable suspicion, will not violate the Fourth Amendment. Specifically, in Mason, the court held that officers may question motorists about matters unrelated to the original justification for the traffic stop as long as the questioning "occurs within the timeframe reasonably necessary to effectuate the traffic stop." 628 F.3d at 131. Thus, in that case, unrelated questioning that took "one to one and one-half minutes" was not unreasonable, because the stop was conducted "promptly and with efficiency." Id. at 131-32.

The Fourth Circuit has since reiterated that the overall inquiry is one of reasonableness viewed through the totality of the circumstances. See Guijon-Ortiz, 660 F.3d at 767. ("[U]ltimately the reasonableness of an extended seizure for an unrelated investigation is evaluated under the totality of the circumstances."). For example, in Farrior, the Fourth Circuit held that, although the driver had previously been told he was free to go, a subsequent extension of the traffic stop to issue a warning ticket during which time a drug dog sniff was conducted was not unreasonable as a violation of the Fourth Amendment. 535 F.3d at 220. In that case, an inexperienced officer held a defendant's license and registration to write a warning ticket. Id. The delay while the warning ticket was issued allowed a drug dog to arrive on the scene and ultimately

37

alert for the presence of drugs. Id. The court held that the additional time it took to write the warning ticket was not a violation of the Fourth Amendment because it was only a *de minimis* intrusion on the defendant's rights. Id. In so doing, the court cited with approval United States v. Alexander, 448 F.3d 1014 (8th Cir. 2006), cert. denied, 549 U.S. 1118 (2007), which is directly analogous.

In Alexander, the Eighth Circuit found that a four-minute delay between the completion of a traffic stop and a drug dog's alert did not violate the Fourth Amendment because it was only a *de minimis* intrusion. 448 F.3d at 1017. In other cases, similarly short periods of time between the completion of a traffic stop and a drug dog sniff or alert have also been found to be constitutional. See, e.g., U.S. v. Martin, 411 F.3d 998 (8th Cir. 2005) (no constitutional violation when the time between delivery of the citation and the dog's alert was approximately two minutes); United States v. $404,905.00 in U.S. Currency, 182 F.3d 643 (8th Cir. 1999) (a delay of thirty seconds to two minutes to deploy a drug dog after the completion of a traffic stop does not violate the Fourth Amendment); U.S. v. Mohamed, No. 06-3114-06-CR-S-GAF, 2007 WL 3352491 (W.D. Mo. Nov. 9, 2007) (no constitutional violation when less than five minutes elapsed from the time the officer issued the defendant the warning ticket until the dog conducted her sniff); Hugueley

38

v. Dresden Police Dept., 469 F. Supp. 2d 507 (W.D. Tenn. 2007)
(two minute and thirty-second delay in time between completion
of traffic stop and dog alert was not a constitutional
violation). However, a long delay, especially when the drug dog
is not immediately available at the scene, may result in a
finding that the Fourth Amendment was violated. See Boyce, 351
F.3d at 1104, 1111 (finding Fourth Amendment violation when the
drug dog was not at the scene and did not arrive and alert until
twelve minutes after the officer issued a "courtesy warning").

In the present case, the time between the termination of
the consensual encounter upon Williams' refusal to consent to a
search and the drug dog's alert was only two minutes and forty
seconds. The officers acted diligently throughout the stop
(which included the administration of a breathalyzer to
Williams), and there is no evidence that this delay was caused
by stalling on the part of the officers. The drug dog was
available at the scene, was dispatched forthwith, and conducted
her sniff immediately upon her bathroom break. See $404,905.00
in U.S. Currency, 182 F.3d at 649 ("[W]hen a police officer
makes a traffic stop and has at his immediate disposal the
canine resources to employ this uniquely limited investigative
procedure, it does not violate the Fourth Amendment to require
that the offending motorist's detention be momentarily extended
for a canine sniff of the vehicle's exterior.").

The court need not ascertain the exact location of the line between a delay that is *de minimis* and one that is unreasonable. Each case is decided on its own facts, considering the totality of the circumstances. On this record, the court concludes, alternatively, that a detention of two minutes and forty seconds for the drug dog sniff falls within the general parameters of a *de minimis* delay that does not offend the Fourth Amendment.

## III. CONCLUSION

For the reasons stated, the court finds that Defendants' Fourth Amendment rights were not infringed during the traffic stop of their vehicle on February 13, 2012.

IT IS THEREFORE ORDERED that Defendants' motions to suppress (Docs. 19, 20) are DENIED.

/s/   Thomas D. Schroeder
United States District Judge

April 9, 2013